CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
7/20/2026
LAURA A. AUSTIN, CLERK
BY: s/ C. Amos
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION**

| | |
|---|---|
| NILOOFAR ILBAKI ARAGH,<br><br>      *Petitioner,*<br><br>  v.<br><br>SAEED ABEDINI,<br><br>      *Respondent.* | CASE NO. 6:26-CV-00071<br><br>**FINDINGS OF FACT &<br>CONCLUSIONS OF LAW**<br><br>JUDGE NORMAN K. MOON |

Niloofar Ilbaki Aragh ("Petitioner") filed a verified petition requesting the return of her daughter, R.R.A., in accordance with the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601–11610, and Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention"). Petitioner alleged that R.R.A.'s father, Saeed Abedini ("Respondent"), wrongfully removed R.R.A. from Turkey to the United States on January 9, 2025. Dkt. 1 ¶¶ 24-25, 42. On July 13, 2026, the Court held an evidentiary hearing on the verified petition and ordered R.R.A.'s return. Dkt. 58.[1] The following findings of fact and conclusions of law support that decision.

## APPLICABLE LAW

Under the Hague Convention, for a Court to order a child's return, Petitioner must prove by a preponderance of the evidence that: (1) the child was "habitually resident" in the country at the time Respondent removed her; (2) the removal was in breach of Petitioner's custody rights;

---

[1] As the Court enumerated in its order, the decision to return R.R.A. was issued immediately following the hearing's conclusion because of "substantial evidence" concerning "Respondent's history of failure to comply with court orders and Respondent's correspondence insisting he would defy an order transferring custody." Dkt. 58 at 2.

and (3) Petitioner had been exercising those rights at the time of removal. *See Miller v. Miller*, 240 F.3d 392, 398 (4th Cir. 2001); *see also Davis v. Lake*, 647 F. Supp. 3d 482, 491 (W.D. Va. 2022). If Petitioner meets this burden, the child must be returned unless Respondent establishes one of five available defenses. *See* § 11603(e)(2)(A); § 11603(e)(2)(B); *Davis*, 647 F. Supp. 3d at 494.

## FINDINGS OF FACT

Respondent and Petitioner are both originally from the Islamic Republic of Iran; Respondent is a United States citizen, and Petitioner holds refugee status in Turkey. Dkt. 53 ¶ 3-4; *see also* H'rg Tr. 7/13/26 ("H'rg Tr.") 49:1–2, 76:5–8. Respondent was formerly imprisoned by Iran between 2012 and 2016, *id.* 89:22–25, and was released as part of a prisoner exchange with the United States in January 2016. Dkt. 1 ¶ 9.[2] Respondent and Petitioner, who became romantically involved, began cohabitating in Turkey in 2019. *Id.* 112:19–20. Though Respondent and Petitioner never legally married and have no Turkish marriage certificate, Respondent performed a "religious" marriage ceremony and declared Petitioner to be his wife. Dkt. 53 ¶ 9; *see also* H'rg Tr. 53: 1–7, 113:7–11.

R.R.A. was born on May 12, 2021, in Fethiye, Turkey. H'rg Tr. 28: 11–12. Petitioner is her biological mother; Respondent is her biological father. *Id.* 47:10–14. As the parties were not legally married, custody of R.R.A. vested exclusively with Petitioner under Turkish law. P. Ex. 12; H'rg Tr. 30:19–24. Respondent is not listed on R.R.A.'s Turkish birth certificate and has never been granted any custodial rights over R.R.A. under Turkish law. *Id.*[3]

---

[2]    Respondent did not answer this allegation in the Verified Petition, and therefore, it is admitted. Fed. R. Civ. P. 8(b)(6) ("An allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied.").

[3]    Respondent's first name is listed on R.R.A.'s Turkish national I.D. card at Petitioner's request. *Id.* 47:22–48:5.

2

From R.R.A.'s birth until Respondent removed her from Turkey at age three and a half, Petitioner served as her primary caregiver. H'rg Tr. 31:13–15, 51:4–7. She fed her, bathed her, and arranged her medical care with two different pediatricians. P. Ex. 20; H'rg Tr. 29:11–25, 30:1–32:6, 49:6–50:8, 51:4–7. Petitioner also enrolled R.R.A. in a part-time nursery school when she was two, and a full-time pre-K program when she was three. *Id.* 49:6–50:8. While living in Turkey, R.R.A. was learning three languages—Farsi, Turkish, and English. *Id.* at 30:1–7. Moreover, based on photographic evidence and Petitioner's testimony, R.R.A. appeared to have a close relationship with her mother and her half-brother for the first years of her life. P. Ex. 20.[4]

In Turkey, Respondent assisted in the financial care of R.R.A.; the parties often split costs 50/50; and Respondent once paid for her medical care at an American hospital in Bodrum. H'rg Tr. 51:8–11, 53:25–54:4. Respondent, though still in a relationship with Petitioner, traveled frequently for speaking engagements around the world. Dkt. 47 at 6.

In 2023, the parties decided to procure an American passport for R.R.A. H'rg Tr. 54:5–55:23. At the American embassy, the parties discussed that Respondent may remove R.R.A. from Turkey if she ever became unsafe. *Id.* The parties disagree about to the scope, duration, and terms of any agreement; however, the parties' circumstances changed dramatically between 2023 and 2024.[5] Therefore, the Court finds Petitioner did not perpetually consent to R.R.A.'s removal from Turkey without permission.

---

[4]    Respondent testified that R.R.A. was unhappy due to three accidents while in Turkey: (1) she was burned by hot water; (2) her half-brother cut her face; and (3) she fell and hit her head. *H'rg Tr.* 93:14–25.

[5]    The discussion occurred (1) while the parties were still romantically involved, (2) before Respondent had been charged in Turkey with sexually assaulting a minor, and (3) at least one year before Respondent actually removed R.R.A. from Turkey. H'rg Tr. 54:5–55:23.

At Petitioner's request, Turkish courts entered two protective orders against Respondent in 2023 and 2024.[6] H'rg Tr. 111:18–113:4; Dkt. 53 ¶ 13. The parties separated in 2024. H'rg Tr. 73:4–5. Respondent claimed he moved from Petitioner's residence to a campground where he "lived under no name" due to safety concerns that he was being followed and harassed by the Turkish police and Iranian intelligence officials. *Id.* 98:5–23. The Court finds it more likely that Respondent moved from Petitioner's home because of domestic discord and the protective orders imposed against him.

On December 19, 2024, Respondent was arrested and charged with "Sexual Abuse of Child through Molestation," and a Turkish court placed him under the following conditions of release: (1) mandatory check-ins with the police every Wednesday and Friday; and (2) an absolute ban on leaving Turkey.[7] *Id.* 114:12–115:10; Dkt. 7; Dkt. 53 ¶ 10. During his interview with police, Respondent stated that he "assumed [the minor victim] was an adult based on her appearance." Dkt. 7. He also stated he "did not engage in any sexual conduct [and] did not touch the complainant's hips." *Id.*

A day later, immediately upon his release from police custody, Respondent approached Petitioner about taking R.R.A. from Bodrum to Istanbul to visit his mother. Hr'g Tr. 32:7–13, 34:4–15. Eleven days after his arrest, on December 30, 2024, Respondent took R.R.A. and promised to bring her back on January 9, 2025. *Id.*[8] Petitioner allowed Respondent to take R.R.A.'s

---

[6]   Petitioner did not move to admit the protective orders into evidence during the hearing, so the Court cannot make a finding of fact as to why she sought them.

[7]   During the hearing, Respondent testified that he had been imprisoned in Iran on "false criminal" charges and that the Turkish government, which charged Abedini with sexual molestation of a minor, followed an "exact[] copy/paste [of] the same process" in Iran. Hr'g Tr. 102:2; 138:18–139:4.

[8]   Petitioner testified that she did not know the nature of Respondent's charges in December 2024.

U.S. passport with her because Respondent told Petitioner that R.R.A., due to her refugee status, could not travel freely throughout Turkey without proper identification. *Id.* 34:1–3.

Respondent did not return R.R.A. on January 9 as the parties had agreed. *Id.* 34:4–15. Instead, he sent a text message to Petitioner that read, in relevant part, "Don't worry, I will take your daughter to a good country. The state here is already corrupt, nothing is being done for me. They will put me in prison, and your child will be left without a father." Dkt. 53 ¶ 12; H'rg Tr. 34:16–21, 36:4-9. Petitioner immediately contacted the Turkish police, courts, Respondent, and Respondent's mother, objecting to R.R.A.'s removal from Turkey. *Id.* 36:10–18.

Respondent testified that he brought R.R.A. to the United States because he believed his life was in danger in Turkey.[9] The Court finds there was no credible, imminent threat to Respondent from the Turkish or Iranian government when he removed R.R.A. Due to the close temporal proximity of his arrest and his leaving the country, the Court finds it more probable that Respondent left to avoid prosecution rather than to avoid physical danger or to keep R.R.A. safe.[10]

After Respondent abducted R.R.A., they first traveled to the country of Georgia and then to Israel. *Id.* 105:10–11. They eventually came to Lynchburg, Virginia, residing either in his

---

[9]     Respondent identified two events that made him fearful. First, he encountered "two radical Muslims" who told him they planned to kill him but were going to come back the next day because Respondent had "six trained dogs" with him. *Id.* 96:16–24. Second, he encountered the "Iranian intelligence apparatus" in Turkey, *id.* 96:25–97:12, including one evening when Iranian intelligence police came to his house in Bodrum and said "we're going to keep your daughter here. We're going to make her Muslim. We're going to marry her with radical Muslim." *Id.* 98:5–24.

When asked if Respondent put R.R.A. in harm's way (given his testimony about the many death threats he faced) by keeping her close to him, he said that R.R.A. was safer with him in the United States than in Turkey with her mother but provided no credible evidence that R.R.A. was in any danger in Turkey. *Id.* 143:9–144:23.

[10]    Petitioner testified that during her five-year relationship with Respondent, she never witnessed any harassment by Turkish or Iranian authorities and never sensed that Respondent or R.R.A. were in any danger. *Id.* 46:2–4, 54:21–56:21.

brother's apartment, an RV, or hotels. *Id.* 20:23–21:2, 24:2–12, 73:1–3, 77:12–16, 171:3–12. R.R.A. has extended family in Lynchburg, including her paternal grandfather, paternal aunt, paternal uncle, and paternal first cousin. *Id.* 15:9–7, 77:12–19. Respondent enrolled R.R.A. at Timberlake Christian School during the spring of 2025. *Id.* 79:19–20; *see also* R. Ex. 1.[11]

Once summer began, Respondent and R.R.A. began a trip across the United States and Canada. H'rg Tr. 92:19–21, 125:4–10. They spent approximately two months in Boise, Idaho, but left there after receiving a package of R.R.A.'s toys that contained a tracking device. *Id.* 81:4–10. Respondent claims that, because he feared he was being tracked by the Turkish government, he and R.R.A. left Boise and visited "one thousand cities' location" and "50 states plus Canada." *Id.* 81:4–10, 92:19–21, 116:13-16, 125:4–10.

On November 18, 2025, Respondent received a letter from the United States' Department of State asking him to return R.R.A. to Turkey. H'rg Tr. 117:9–12. Sometime in December 2025, Respondent and R.R.A. returned to Lynchburg. *Id.* 26:6–14, 126:17–19. Respondent testified that the "minute [they] arrived in Lynchburg," Turkish or Iranian operatives robbed his RV, stealing his phone and laptop. *Id.* 123:7–14.[12]

On December 3, 2025, R.R.A. began swimming lessons at the YMCA. R Ex. 6. On January 15, 2026, Respondent enrolled R.R.A. at the Randolph College nursery school. R. Ex. 2. On February 23, 2026, Respondent purchased a home on Washington Street in Lynchburg where R.R.A. has been living ever since. *Id.* 21:5–9; R. Ex. 7.

---

[11]    Respondent asserted R.R.A. was "always" at school with "no absence;" however, his exhibit in support of her attendance is a class picture where she is missing. R. Ex. 1.

[12]    When this theft occurred, Respondent had parked the RV overnight in front of the "Lynchburg grand hotel downtown" on Main Street. H'rg Tr. 124:1-23. He claimed this could not be a normal car break-in because "it's a series of things happening every week. Trackers, they're still in RV here and then sending someone in front of my house here." *Id.* 126:3-5.

Beginning in March 2026—four months after receiving the Hague Convention notice from the State Department—Respondent enrolled R.R.A. in gymnastics, karate, and dance classes. R Exs. 4-6; H'rg Tr. 17:19, 18:3–5, 86:9–17, 134:15. Respondent applied for R.R.A. to begin kindergarten at Liberty Christian Academy in September 2026; R.R.A. was accepted but is not yet enrolled as Respondent has not paid the tuition. R. Ex. 3; Hr'g Tr. 132:25–133:6, 137:15–138:10.

Respondent did not testify about R.R.A.'s daily care—who provides her meals, clothing, bathing, etc. The GAL noted that, during one of her meetings with R.R.A., "her hair was unbrushed," she wore "a dress with light staining," and also had "a broken shoe." Dkt. 47 at 11. When asked about R.R.A.'s healthcare providers in Lynchburg, Respondent could not remember the names of any providers (R.R.A.'s pediatrician, dentist, or any other medical provider), citing the fact that his phone was stolen in December 2025. *Id.* 122:3–123:10. R.R.A. has not received any vaccinations in the United States. *Id.* 127:5–24.

R.R.A.'s paternal aunt testified that R.R.A. travels with Respondent when he has speaking engagements and that she has only stayed overnight with their family "one night." H'rg Tr. 21:12-15. Respondent did not rebut this testimony and did not offer further details about who takes care of her during these work trips.[13] The Court finds that R.R.A. travels with Respondent when he has speaking engagements rather than staying in Lynchburg with extended family to care for her.

The Court finds R.R.A. speaks and understands both Farsi and English. Petitioner testified that she communicates with R.R.A. in Farsi. H'rg Tr. 52:14-16. R.R.A.'s paternal aunt and maternal aunt testified to the same. *Id.* 17:2-7, 159:24–25. In contrast, Respondent testified that R.R.A. struggles to communicate in Farsi, getting "frustrated" or "even angry" when attempting

---

[13]    R.R.A.'s paternal aunt testified that when Respondent was at a recent speaking engagement in Washington D.C., "[R.R.A.] was engaged in a day care" where "he paid" someone who "care[d] [for her] for a couple of hours." H'rg Tr. 21:23-22:7.

to speak it. *Id.* 107:17. Despite his assertions, the Court finds that other credible record evidence, such as Petitioner's and the aunts' testimony, demonstrates Respondent exaggerated R.R.A.'s struggles communicating in Farsi. *Id.* 107:14-17, 113:21-23.

## CREDIBILITY DETERMINATIONS

Based on the evidence, as well as the Court's observations of the parties and witnesses at the hearings in this case, the Court finds that Petitioner, Petitioner's sister, Respondent's sister, and Respondent's brother are credible witnesses. The Court, however, finds that Respondent is not as credible of a witness.

The Court observed Respondent for several hours during this case's hearings; his testimony was inconsistent and often conflicting. Several examples demonstrate this issue. First, consider how Respondent's impression of the Turkish criminal case changed throughout the hearing. He first testified at length about how, after he was charged, the judge went to great lengths to "listen[] to [him] and review[] the video evidence" against him, allowing him to be released on conditions pending trial. H'rg Tr. 101:23-102:18. In contrast, after a few short minutes passed, he said that the Turkish judge's "goal was to send [him] to jail." *Id.* 141:1-18.

Next, consider how Respondent's testimony about when he traveled with R.R.A. has changed throughout the case. He told the GAL that he "traveled to Boise, Idaho for the summer 2025" and then "returned to Lynchburg." Dkt. 47 at 10. During the hearing, however, he testified that he returned to Lynchburg "for Christmas" in "December of 2025." H'rg Tr. 126:17-127:1. This inconsistency with his travel dates demonstrates R.R.A. was on the road for a significantly longer period of time than he originally stated.

Finally, consider how Respondent's reasons for leaving Turkey with R.R.A. have changed throughout the case. In his initial text to Petitioner on January 9, 2025, he explained he was leaving

8

because "[t]hey will put me in prison, and your child will be left without a father." Dkt. 53 ¶ 12; H'rg Tr. 34:16–21, 36:4-9. Now, he emphasizes his fear of the Turkish and Iranian governments citing (1) when they approached him on the beach, but were thwarted due to his dogs; (2) the threats made to "marry R.R.A. with radical Muslim;" (3) the tracker placed in a box of R.R.A.'s toys from Turkey; and (4) the theft of his phone and laptop from his RV as reasons why felt compelled to take R.R.A. in order to protect her from the Turks and the Iranians. H'rg Tr. 143:19-20.[14] But these encounters in no way involved a credible attempt on his, or R.R.A.'s, personal safety. Indeed, credible record evidence indicates he left Turkey at the first opportunity he could after being arrested and charged for the sexual abuse of a minor. H'rg Tr. 114:10-18.

For these reasons, among others, the Court gives greater weight to the testimony of Petitioner, Petitioner's sister, Respondent's sister, and Respondent's brother than to Respondent's.

## CONCLUSIONS OF LAW

### A. Petitioner Has Established Her *Prima Facie* Case

#### 1. R.R.A. was a Habitual Resident in Turkey Before Her Removal

Under the first *prima facie* element, Petitioner must prove by a preponderance of the evidence that R.R.A. was a "habitual resident" in Turkey immediately before her removal on January 9, 2025. *Miller*, 240 F.3d at 398. Although the Convention's text does not define "habitual residence," "a child habitually resides where she is at home." *Monasky v. Taglieri*, 589 U.S. 68, 76 (2020). Determining a child's habitual residence is a "fact-driven inquiry" that must be "sensitive to the unique circumstances of the case and informed by common sense." *Id.* (quoting *Redmond v. Redmond*, 724 F.3d 729, 744 (7th Cir. 2013)).

---

[14]    Despite these safety concerns, Respondent posted voluminous pictures of R.R.A. on social media, including many pictures in front of their home in Lynchburg (where the house number is clearly apparent)—calling their legitimacy into question. H'rg Tr. 130:16–132:15.

R.R.A. was a habitual resident in Turkey at the time of her removal. R.R.A. was born in Turkey in 2021 and resided with her mother from birth until January 2025. P Ex. 1 (Birth Certificate); H'rg Tr. 29:11–25, 30:1–32:6, 49:6–50:8. She attended pre-K classes and was under the care of two pediatricians. Dkt. 48 at 5; H'rg Tr. 29:11–25, 30:1–32:6, 49:6–50:8. Accordingly, the Court concludes that Petitioner has established the first element.

2. *Removal Breached Petitioner's Custody Rights under Turkish Law*

Under the second element of the *prima facie* case, Petitioner must prove by a preponderance of the evidence that R.R.A.'s removal breached Petitioner's custody rights under Turkish law. *Miller*, 240 F.3d at 398. Article 337 of the Turkish Civil Code provides that where the parties are not married, parental authority over a child belongs to the mother. P. Ex. 12. Under that provision, a father may acquire custody only if a Turkish court appoints him or transfers custody to him upon a statutory ground. *Id.*

Here, Respondent does not dispute, and the record evidence clearly establishes, that Petitioner possessed custodial rights over R.R.A. at the time of her removal as: (1) Petitioner is R.R.A.'s biological mother; (2) Petitioner and Respondent were never married under Turkish law; and (3) no Turkish court order exists altering Petitioner's custodial rights or establishing a different custodial arrangement between the parties. P. Ex. 1; H'rg Tr. 30:19–24.[15] Accordingly, Petitioner was R.R.A.'s sole legal custodian in January 2025, and the Court concludes Petitioner has established the second element.

---

[15]    Indeed, Respondent acknowledges that the parties' marriage was not registered as a civil marriage in Turkey and that under Turkish law he has no custodial rights over R.R.A. Dkt. 53 ¶ 9; Dkt. 54 at 8.

3. *Petitioner was Exercising Custody Rights under Turkish Law at the Time of R.R.A.'s Removal*

Finally, Petitioner must prove by a preponderance of the evidence that she was exercising her custodial rights at the time of removal. *Miller*, 240 F.3d at 398. The evidence overwhelmingly establishes this element. In Turkey, Petitioner was R.R.A.'s day-to-day primary caregiver. Dkt. 48 at 5; H'rg Tr. 29:11–25, 30:1–32:6, 49:6–50:8. She fed her, bathed her, transported her to and from pre-K, arranged her medical care, and always lived with her during her time in Turkey. P. Ex. 20; H'rg Tr. 29:11–25, 30:1–32:6, 49:6–50:8, 51:4–7.

Petitioner also acted diligently and without delay to secure R.R.A.'s return. The day R.R.A. was removed, Petitioner: (1) repeatedly called Respondent; (2) reported the matter to the police; and (3) contacted the airlines directly to prevent Respondent from leaving the country with R.R.A. The following day, Petitioner provide a formal statement to the police; filed a criminal complaint; retained counsel in Turkey; submitted a Hague Convention application to Turkey's Central Authority; and separately submitted filings with European Union authorities.[16] She never consented to R.R.A.'s removal.[17] The Court concludes Petitioner has established the third element.

Because the Court concludes Petitioner has established the elements of a *prima facie* case of wrongful removal, the Court must order R.R.A.'s return unless Respondent can establish a Hague Convention defense.

---

[16]    Petitioner further pursued R.R.A.'s return by executing a power of attorney authorizing her sister, a citizen of the United States, to assist in coordinating her case in the United States. P. Ex. 13. Petitioner also filed the instant Petition with this Court.

[17]    Respondent admits he "removed the Child from Turkey to the United States in late 2024/early 2025 and that he did not obtain Petitioner's advance consent to relocate the Child permanently to the United States." *See* Dkt. 53 ¶ 8.

**B.  Respondent Has Not Established a Defense**

At the hearing, and in Respondent's briefing, he raises four Hague Convention defenses: (1) that R.R.A. is "well-settled" in the United States; (2) that returning R.R.A. to Turkey poses a "grave risk" of "physical or psychological harm or otherwise places [R.R.A.] in an intolerable situation; (3) that returning R.R.A. would not be permitted by "fundamental principles of the United States relating to the protection of human rights and fundamental freedoms;" and (4) that Petitioner consented to R.R.A.'s removal. *See Miller*, 240 F.3d at 398; *Bader*, 484 F.3d at 668-69. Respondent has the burden of proof on each defense.

*1.  Respondent Has Not Established R.R.A. is Well-Settled*

Hague Convention Article 12 requires the prompt return of a wrongfully removed child where the petition is filed within one year of the removal. If the petition is filed more than one year after the removal, the court "shall also order the return of the child . . . unless it is demonstrated that the child is now settled in [her] new environment." Hague Convention, art. 12. Respondent must establish the "well-settled" defense by a preponderance of the evidence. 22 U.S.C. § 9003(e)(2)(B).

To succeed on a "well-settled" defense, a Respondent must present "substantial evidence of the child's significant connections to the new country." *Lozano v. Alvarez*, 697 F.3d 41, 45 (2d Cir. 2012) (quoting Department of State, Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10,494, 10,509 (Mar. 26, 1986)), *aff'd sub nom. Lozano v. Montoya Alvarez*, 572 U.S. 1 (2014). When making these determinations, courts consider the child's age; the stability of the child's residence; school or day-care attendance; participation in community or extracurricular activities; the respondent's employment and financial stability; the presence of friends and relatives in the new area; language proficiency; and the child's immigration

12

status. *Id.*; *see also Monasky v. Taglieri*, 589 U.S. 68, 78, n.3 (2020); *Alfonso V.H. v. Cristina A.Z.*, 512 F. Supp. 3d 633, 646 (W.D. Va. 2021).

   a.   *Well-Settled Factors*

      i.   *Age*

"[A] very young child [is] not able to form the same level of attachments and connections to a new environment as an older child" and is "not capable of forming the kind of enduring attachments that the Convention deems sufficient to override its default return remedy." *Guevara v. Casto*, 155 F.4th 353, 364 (5th Cir. 2025) (quoting *Hernandez v. Garcia Pena*, 820 F.3d 782, 789 (5th Cir. 2016)); *Alfonso V.H.*, 512 F. Supp. 3d at 646-47. According to Petitioner's testimony, R.R.A. recently turned five years old, and Respondent removed R.R.A. from Turkey when she was three and a half years old, meaning she is still "very young." H'rg Tr. 28:11-15; P. Ex. 1; Dkt. 53 at 8-9; Dkt. 1 ¶ 10.

      ii.   *Stability of R.R.A.'s Residence*

Respondent told the guardian *ad litem* ("GAL") that he "resided with his brother in Lynchburg, Virginia from January 2025 until the summer break"; "traveled to Boise, Idaho for the summer 2025"; and then "returned to Lynchburg." Dkt. 47 at 10. Record evidence is inconsistent as to where R.R.A. and Respondent lived in Lynchburg from January 2025 to May 2025. H'rg Tr. 20:23–21:2, 24:2–12, 73:1–3, 77:12–16, 171:3–12. And at the hearing, Respondent testified he (1) did not return to Lynchburg until December 2025 and (2) did not purchase a permanent residence

13

until February 2026.[18] H'rg Tr. 88:5-23; 171:8-12.[19] Although R.R.A. has lived in the same house for the last six months, the first year of her life in the United States was transitory.

### iii. School or Daycare Attendance

Respondent told the GAL that R.R.A. has attended two schools since January 2025—(1) Timberlake Christian School; and (2) Randolph University School—and further testified that he has enrolled R.R.A. in kindergarten at Liberty Christian Academy. Dkt. 47 at 12. Record evidence confirms R.R.A.'s enrollment in two schools but does not credibly establish that she regularly attended either school.

R.R.A. did not attend a full year of pre-K at either school.[20] And as to her attendance, Respondent did not introduce any attendance records, teacher evaluations, or other testimony to corroborate his assertions that she "always attend to the school." H'rg Tr. 126:10-12. Finally, Respondent's testimony that he visited "one thousand cities' location" including "Yellowstone, Florida, [and] California" calls R.R.A.'s ability to attend school into question. *Id.* 81:4–10, 92:19–21, 116:13-16, 125:4–10.

---

[18] Respondent's sister's testimony confirmed this, as she did not recall meeting R.R.A. until Christmas 2025, despite living in Lynchburg since August 2025. H'rg Tr. 26:2-18.

[19] This lengthy transitory period was largely motivated by Respondent's claims that the Turkish government was tracking him. H'rg Tr. 81:4-10; 123:11-19; 123:25-124:14; 126:17-24.

[20] Because she arrived in the United States in January 2025, R.R.A. could have, at most, attended Timberlake Christian School from January 2025 to May 2025 (before Respondent began traveling). During the next school year, R.R.A. could only have attended Randolph University's pre-K from January 2026-May 2026 as Respondent was not in Lynchburg from August 2025 to December 2025 (the first half of the 2025-2026 school year).

*iv.    Participation in Community or Extracurricular Activities*

Respondent told the GAL that R.R.A. "started karate in 2025" and "recently started gymnastics." Dkt. 47 at 12.[21] Respondent testified that R.R.A. is enrolled in swimming lessons at the YMCA and dance classes that are scheduled to begin in a few months. H'rg Tr. 86:8-23; R. Exs. 4-6. Yet, Respondent enrolled in R.R.A. in most of these activities after the United States' Department of State asked him to return R.R.A. Due to the timing of her enrollment in these activities, the Court is left without a clear picture of her actual attendance and participation.[22]

*v.    Respondent's Employment and Financial Stability*

Throughout this case, Respondent testified he is a "pastor" who can be "retained for speaking engagements," and "he is . . . self-employed." Dkt. 47 at 3; Trial Tr. June 22, 2026, 16:24-17:2; H'rg Tr. 138:21-23. In a prior hearing, Respondent testified that he has a "non-profit" "ministry." Dkt. 62 at 17:3-18:25. When asked about the location of his ministry, Respondent claimed the FBI told him to not have an address for safety reasons. *Id.* The Court infers he travels the country making speeches about his imprisonment in Iran and his claims of religious persecution. This evidence does not indicate that Respondent's employment is consistent. It further offers no indication of how his employment (i.e., his travel to speaking engagements) affects his ability to care for R.R.A.

---

[21]    During her interview with the GAL, R.R.A. did not know the name of the church she attended and said she did not attend Sunday school. Dkt. 47 at 12-13.

[22]    Courts "must be wary of rewarding an abductor for concealing the whereabouts of a child long enough for the child to become 'well-settled.'" *Belay v. Getachew*, 272 F. Supp. 2d 553, 561 (D. Md. 2003). Respondents (especially those with greater financial means than Petitioners) cannot paper over their wrongdoing by filling the child's calendar with lessons and activities. This factor looks to whether the child has developed long-term and meaningful community connections, not whether a Respondent has recently enrolled the child in activities to bolster a Hague Convention defense. Had R.R.A. been consistently enrolled in these activities for a year or more instead of mere months, this factor would likely have cut in the other direction.

In addition to income from his speaking engagements, Respondent testified to receiving income from a default judgment against Iran from which he often receives payouts. H'rg Tr. 90:2-91:8; R Ex. 8. These payouts vary in amount, from $0 to over $800,000 according to his testimony. *Id.* He also presented evidence of a well-apportioned room R.R.A. has in his residence, R. Ex. 7, and of his significant financial means, R. Ex. 8. This evidence indicates Respondent is financially stable.

> vi.    *Presence of Friends and Relatives in the New Area*

R.R.A.'s paternal aunt, uncle, and grandparents live in Lynchburg, Virginia. Dkt. 47 at 13; H'rg Tr. 14:11-23; 148:13-19; 177:18-25. She also has a three-year-old cousin who she sees for playdates, though the Court heard no testimony as to how frequently the children visit each other. *Id.* 14:19-23. The Court observed R.R.A. with some of these relatives during hearings in this case, and she appears comfortable around them. Further, Respondent and Respondent's sister testified that R.R.A. has friends from school who visit the house; has attended birthday parties; and enjoys spending time with children in her gymnastics class. H'rg Tr. 16:5–18:25, 82:19-22.

> vii.    *Language Proficiency*

As the Court found above, R.R.A. is proficient in both English and Farsi. Given her age, her language skills are still modest. Despite Respondent's exaggerated testimony that R.R.A. has forgotten how to speak Farsi and is only proficient in English, the Court finds she is sufficiently proficiency in Farsi to communicate with relatives and will not have linguistic difficulty adjusting back to Turkey. H'rg Tr. 107:14-17, 113:21-23.

        *viii.    R.R.A.'s Immigration Status*

R.R.A.'s immigration status is "held to be relevant only if there is an immediate, concrete risk of deportation." *Alcala v. Hernandez*, 2015 WL 4429425, at *10 (D.S.C. July 20, 2015). No record evidence exists that R.R.A. would be at risk of deportation upon her return to Turkey.[23]

      *b.    Well-Settled Conclusion*

After considering the evidence and the relevant factors, the Court concludes the weight of the evidence demonstrates that R.R.A. is not well-settled within the meaning of the Hague Convention. Thus, Respondent has not established this defense by a preponderance of the evidence.

   *2.  R.R.A. Faces No Grave Risk of Physical or Psychological Harm in Turkey*

A court can decline to order return where there is "a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b). This defense must be established by clear and convincing evidence, 22 U.S.C. § 9003(e)(2)(A), and is construed narrowly, as it is generally reserved for cases where there is an "imminent danger prior to the resolution of the custody dispute, e.g., returning the child to a zone of war, famine, or disease," or "serious abuse or neglect" where the country of habitual residence is unable or unwilling to protect the child. *Walsh v. Walsh*, 221 F.3d 204, 221 (1st Cir. 2000) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1068 (6th Cir. 1996)).

Respondent raises concerns of a "mafia team" supported by the "Iran and Turkey regime" who are "planing (sic) [his] trap and return to Iran." Dkt. 42. He further explained to the Court (in

---

[23]    In addition to the factors considered above, the Court did not hear testimony about who is responsible for R.R.A.'s care—meaning who prepares her meals, tends to her hygiene, provides transportation, etc. And evidence from the GAL suggests that R.R.A.'s needs, in this regard, are not being met. Dkt. 47 at 11.

email correspondence and his testimony) that he had concerns about Petitioner's parenting—such as her "involvement in prostitution;" "bad injures" R.R.A. received in Bodrum; and that Petitioner would "not let[] R.R.A. sleep or eat . . . because she was always busy partying" but did not introduce evidence during the hearing substantiating any of his concerns. H'rg Tr. 93:13-25. Petitioner denied all these allegations as fabricated. *Id.* 152:9.[24]

The Court concludes that Respondent has failed to provide credible testimony of grave harms faced by R.R.A. upon her return to Turkey. As this defense requires "clear and convincing evidence," Respondent does not meet his evidentiary burden.[25]

3. *R.R.A.'s Return is not Counter to United States' Interests*

Article 20 permits the court to refuse return "if this would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." Hague Convention, art. 20. Like the grave-risk defense, it must be established by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A). Article 20 is almost never invoked, and courts that have addressed it agree that it was meant to be "restrictively interpreted and applied ... on the rare occasion that return of a child would utterly shock the conscience of the [c]ourt or offend all notions of due process." *Hazbun Escaf v. Rodriquez*, 200 F. Supp. 2d 603, 611 (E.D. Va. 2002), *aff'd sub nom. Escaf v. Rodriguez*, 52 F. App'x 207 (4th Cir.

---

[24]   Petitioner also testified that during her nearly five-year relationship with Respondent, she never felt that *he* was in danger, much less R.R.A. H'rg Tr. 46:2–4, 54:21–56:21.

[25]   Respondent claims to believe *he* is at grave risk if *he* returned to Turkey. But given the nature of these proceedings, the Court is only concerned with a grave risk of harm to R.R.A., and Respondent has not procedure credible, concrete evidence of danger to her. Respondent faces a criminal trial if he returns to Turkey.

2002).[26] Because nothing in this record concerning R.R.A.'s return to Turkey "utterly shock[s] the conscious of the court," Respondent has not shown by clear and convincing evidence that R.R.A.'s return would violate fundamental principles of the United States. *Sabogal*, 106 F. Supp. at 711.

4.  *Petitioner Did Not Consent to R.R.A.'s Removal*

Article 13 provides that a Court is not "bound to order the return of the child if the [Respondent] established that . . . [Petitioner] had consented to or subsequently acquiesced in the removal or retention." Hague Convention art. 13. "A petitioner's statements or conduct—formal or informal—can manifest consent" and courts evaluating this defense must "evaluate what the petitioner contemplated and agreed to, as well as the nature and scope of consent, including any conditions or limitations." *Padilla v. Troxell*, 850 F.3d 168, 175-76 (4th Cir. 2017). A district court evaluating a consent defense often "face[s] . . . a choice as to whom it [finds] more believable." *Friedrich v. Friedrich*, 78 F.3d 1060, 1069 (6th Cir. 1996).

During the hearing, Respondent asserted that, in 2023, while he was in a relationship with Petitioner, the parties came to an agreement to get R.R.A. a United States passport—and that Respondent had permission to remove R.R.A. to the United States if safety concerns arose in Turkey. H'rg Tr. 54:8-23. He argued this agreement (1) extended after the relationship ended, and (2) allowed him to remove R.R.A. secretly in order to keep Petitioner safe from the Iranian and Turkish governments. H'rg Tr. 98:24-100:7.

Petitioner's testimony corroborated that the parties had discussed Respondent removing R.R.A. from Turkey if she was ever in danger. H'rg Tr. 54:8-23; 55:18-23. She testified, however, that any amorphous agreement was "due to Mr. Saeed's coercion" and that it was "not relevant to

---

[26]    Indeed, this defense is so rare that "no American court has ever applied" it. *Sabogal v. Velarde*, 106 F. Supp. 689, 711 (D. Md. 2015) (citing Hague Convention art. 20, 19 I.L.M. at 1503.).

19

him wanting to take the child with him" in December 2024/January 2025. *Id.* 54:20; 55:16-17. Thus, this defense requires the Court to make a credibility determination as to the parties' versions of the events.

The Court credits Petitioner's version of the events—a discussion took place in 2023 in which Respondent coerced Petitioner into saying he could take R.R.A. from the country if there was a credible threat of danger to R.R.A. Even though Respondent characterizes the 2023 discussion as an agreement, no credible record evidence exist of any concrete terms like how long the agreement would last or how "danger" was defined. What is clear, though, is that significant changes occurred between 2023 to 2025: by 2025, the parties (1) were no longer romantically involved, (2) Petitioner served two protective orders on Respondent; (3) Respondent had moved out of Petitioner's home; and (4) Respondent had been charged in Turkey with sexually assaulting a minor. H'rg Tr. 54:5–55:23. These changes certainly nullified the discussion (or agreement) from 2023. And even if there was an ongoing agreement in 2025, that agreement *only permitted* R.R.A.'s removal if she was in danger. There is no evidence that R.R.A. was in danger when she was removed from Turkey in 2025; there is credible evidence, however, that Respondent deceived Petitioner to obtain R.R.A.'s passport and claimed that he removed her to give her a better life. Thus, the Court concludes that Respondent has failed to establish his consent defense by a preponderance of the evidence.

### CONCLUSION

The Court concludes the following as a matter of law: Petitioner has established, by a preponderance of the evidence, her *prima facie* case under the Hague Convention.

The Court concludes that:

- R.R.A. was a habitual resident in Turkey in January 2025; and

- Respondent breached Petitioner's custody rights by bringing R.R.A. to the United States; and

- Petitioner was exercising her custody rights in January 2025.

The Court also concludes, as a matter of law, Respondent has failed to establish an available Hague Convention defense by a preponderance of the evidence.

The Court concludes that:

- R.R.A. is not well-settled in Lynchburg, Virginia; and

- Petitioner did not consent to R.R.A.'s removal.

The Court also concludes Respondent has also failed to establish an available Hague Convention defense by clear and convincing evidence.

- R.R.A. does not face a grave risk of physical or psychological harm if she is returned to Turkey; and

- R.R.A.'s return to Turkey would not violate fundamental principles of the United States.

Relying on these conclusions of law, the Court ordered R.R.A.'s return to Turkey.[27]

The Clerk of Court is directed to send a copy of the Court's Findings of Fact and Conclusions of Law to all counsel of record.

Entered this 20th day of July, 2026.

_____
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

---

[27] Although the Court previously stated it would issue a formal return order, Dkt. 58, Petitioner has confirmed that R.R.A. is back in her custody. Any further return order would thus be moot.